**UNITED STATES of America, Appellee,**

v.

**Leonard Wayne KRAGNESS, a/k/a Sonny Kragness, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**Dennis Lloyd DETERS, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**Peter Bernhard CASPERSEN, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**Jerald Arthur HOLBROOK, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**Ronald Francis PRESCOTT, Appellant.**

Nos. 86–5087—86–5091.

United States Court of Appeals, Eighth Circuit.

Submitted March 9, 1987.

Decided Sept. 28, 1987.

Rehearings and Rehearings En Banc Denied Nov. 24, 1987.

Jack L. Nordby, Minneapolis, Minn., for appellant Kragness.

Mark W. Peterson, Minneapolis, Minn., for appellant Caspersen.

Douglas W. Thompson, St. Paul, Minn., for appellant Deters.

Earl P. Gray, St. Paul, Minn., for appellant Prescott.

Joan Ericksen, Asst. U.S. Atty., Minneapolis, Minn., for appellee.

Before HEANEY and ARNOLD, Circuit Judges, and LARSON,[*] Senior District Judge.

ARNOLD, Circuit Judge.

Defendants Leonard Kragness, Dennis Deters, Peter Caspersen, Jerald Holbrook, and Ronald Prescott were charged in a thirteen-count indictment with conspiring to violate and violating the Racketeer-Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1962(c) and (d), with several drug conspiracies, and with other substantive offenses. According to the indictment, the defendants were participants in an organization that, between 1976 and 1984, imported and distributed, and conspired to import and distribute, substantial quantities of marijuana, cocaine, and methaqualone, or quaaludes. They were tried jointly in the United States District Court for the District of Minnesota,[1] and each was convicted of two or more of the crimes charged against him. The defendants raise a number of issues on appeal from these convictions, including issues concerning the interpretation of RICO, double jeopardy, a defendant's right to confront witnesses, prosecutorial comment upon a defendant's failure to testify, and a variety of evidentiary questions.[2] In the main, we affirm.

## I. Facts

We state the facts in the light most favorable to the jury's verdict. The drug organization that is the subject of the indictment began in the small town of Spring Grove, Minnesota. The two central figures in this organization, defendants Leonard Kragness and Dennis Deters, are from Spring Grove and resided there at the outset of these events. Kragness then owned a plumbing and heating business, and Deters owned Deters Veneer and Lumber. Deters's business was later to provide a cover for the drug business; for example, members of the drug organization often claimed to be searching for timber for Deters's company when they were conducting drug-related activities. Two other participants in the business, defendant Jerald Holbrook and government witness Richard Lager, were also from Spring Grove. Holbrook worked for Deters in the lumber business before the drug business began, and continued to be his employee thereafter. John Teeter, a key participant in early drug undertakings, lived in Spring Grove for two years beginning in 1973, and met Kragness then. Defendant Peter Caspersen grew up with Teeter in South Min-

---

[*] The Hon. Earl R. Larson, Senior United States District Judge for the District of Minnesota, sitting by designation.

1. The Hon. Edward J. Devitt, Senior United States District Judge for the District of Minnesota.

2. The defendants, at our direction, avoided unnecessary repetition through filing a joint statement of facts and through incorporation of and reference to portions of each other's briefs. We appreciate their compliance with our request, and shall consider each of the defendants' arguments with respect to every defendant to whom it is relevant.

neapolis, Minnesota, but lived in Colorado when the drug business began.

The government's evidence related to four periods or categories of drug activity involving the defendants. First, there was evidence of drug importation and distribution by Kragness and Teeter from 1976 or 1977 to 1978. Second, there was evidence of a later project to import marijuana from Mexico involving use of a La Junta, Colorado airstrip; events related to this project occurred primarily in 1979. Third, there was evidence of a cocaine-and-quaalude importation project in 1979–1982; most of these transactions involved use of an airport and hangars in Anadarko, Oklahoma, and of a rented house in nearby Chickasha, Oklahoma. Finally, there was evidence of Mexico-Arizona marijuana-smuggling activities undertaken in 1981–82.

The government presented the testimony of about 30 witnesses, but the principal witnesses for the government were three men who participated in this drug business: Richard Lager, Anthony Benanti, and Walter Schieche. Lager, who had been granted immunity from prosecution, testified about Kragness's early drug business with Teeter, about the marijuana importation projects, and about a shipment of cocaine that he helped distribute. Benanti and Schieche, each of whom testified pursuant to a plea agreement, told of the cocaine-and-quaalude end of the business. Benanti had been arrested on drug charges in June 1982, and had served as a government informant for about two years thereafter. Besides the testimony of these and other witnesses, the government introduced a substantial volume of telephone and credit-card records, tracing the movement of and communication between participants in these drug activities, as well as numerous financial documents and records, tracing the money involved.[3]

### A. Early Drug Activities

Kragness, while recruiting Lager for his drug operation in 1979, told Lager of his drug activities with John Teeter during several preceding years. Kragness, a licensed pilot, stated that, among other things, he and Teeter had flown planeloads of marijuana from Mexico into the La Junta, Colorado area, and upon landing had taken the marijuana to the Colorado home of Teeter's friend, Peter Caspersen.[4] Kragness closed his plumbing business at some point before 1979, and became for a time nominally an employee of Deters's lumber business; however, other regular employees of the lumber business testified they never saw Kragness do work for the company.

In 1977–1978, Kragness and Teeter were distributing drugs to a man in Quincy, Illinois named Gene Ferry, according to the testimony of Ferry's girlfriend and of one of his drug customers, Jimmy Schlemm. Ferry worked for a short time in the summer of 1977 in the lumber business of a man who did work for Deters; Ferry had gotten the job after Deters, during a meeting at which Kragness and Holbrook were present, requested that he be hired. In the fall of 1977, Ferry went to work selling marijuana for Kragness. On one occasion in late 1977, Kragness delivered four or five pounds of marijuana to Ferry, and in early 1978 Kragness delivered a kilogram of cocaine to Ferry. In March 1978, in a delivery engineered by Kragness, Teeter brought marijuana and hashish from Colorado to Ferry in Illinois. On March 21, 1978, Teeter went with Ferry to sell part of this shipment to Schlemm; Schlemm murdered Teeter and Ferry, crimes for which he is now imprisoned in Illinois. During the investigation of these murders, Kragness made efforts to prevent discovery of his involvement with Teeter in drugs; however, Kragness on at least one occasion

---

**3.** The defendants also presented documentary evidence and the testimony of a number of witnesses, though each of the defendants invoked his Fifth Amendment right and did not testify himself.

**4.** The trial court admitted this testimony, but later ruled that its admission violated Caspersen's confrontation rights and forbade the government to refer to it in closing argument. Caspersen argues on appeal that admission of this testimony against him requires reversal of his convictions. See *infra* Part VII. B.

acknowledged to an investigator that he had played a role in marijuana importation.

### B. La Junta Marijuana Operations

Lager's first drug-related transaction with Kragness was in November 1978, when he lent Kragness $1,000 and a month later received $1,500 as repayment. Then, in February 1979, Kragness had Lager locate property near La Junta, Colorado for use as a clandestine airfield in the importation of marijuana from Oaxaca, Mexico. After Kragness inspected and approved the land Lager located, Lager, using Kragness's money, purchased the land, placing title in his own name. At the time of the land purchase, Kragness offered, and Lager accepted, a job as a "transporter" in Kragness's drug operation; Lager was to pick up drugs when planes arrived and carry them in a truck to further distribution points. Lager in fact began to perform this task, as well as a variety of others, making him a sort of general errand-boy for the drug organization.

Lager's first chance to act as a transporter came in August 1979, when, at Kragness's request, he traveled to Colorado with Deters and Holbrook. Kragness hoped to have Deters, who is a licensed pilot, take his place and serve as pilot on a drug run into the La Junta airfield. However, Deters was unable at this point to gain the confidence of Salvatore "Sam" Aleto,[5] a financial backer of the project. So the run was aborted, and Lager returned to Minnesota. Lager went to Colorado again in October and before Thanksgiving in November to meet anticipated planeloads of marijuana, but no loads arrived; Lager was told on the latter occasion that Holbrook had driven the marijuana from Mexico to California.

Then, late one night, shortly after Thanksgiving in 1979, Lager, at Kragness's direction, met a plane piloted by Deters and loaded with marijuana at the La Junta airstrip. Lager, Deters, and Kragness loaded the marijuana into a pickup truck. Lager drove the truck to Peter Caspersen's house, where he spent the night. The next morning, Kragness, Deters, and Aleto arrived. The men weighed the marijuana on Caspersen's scale and divided it among Aleto, Caspersen, and Kragness, each of whom had customers for the marijuana. Lager then drove Kragness's share of marijuana to Kragness's Nederland, Colorado home, where he hid it in a chimney. Kragness and two Canadian customers arrived later, and it was agreed that Lager would drive the marijuana to Grand Coulee Dam, Washington, and that Kragness would fly the marijuana from there to Canada. Lager met Kragness and one of the Canadians at the Grand Coulee Dam Airport, and helped them load the marijuana on Kragness's plane. Kragness and the Canadian took off, and Lager returned home.

Shortly before Christmas in 1979, Lager participated in another drug transaction similar to the transaction just after Thanksgiving. Deters piloted a planeload of marijuana into La Junta, Lager transported the marijuana to Caspersen's home, where it was divided up, and Lager then took Kragness's share to Kragness's home in Nederland. After Christmas, Lager drove the marijuana to Grand Coulee Dam, where he met Kragness. During bad weather, the two drove to Canada to meet the Canadians and returned to Grand Coulee Dam, smuggling about $63,000 (Canadian) received from the Canadians through United States Customs by secreting it in a car-door panel. When the weather cleared, Lager and Kragness loaded the marijuana onto a plane, and Kragness flew it to Canada. Upon Kragness's return, Lager went home to Minnesota, carrying the Canadian currency with him.

Over the course of these La Junta operations and thereafter, Lager performed a number of financial transactions related to the drug business. In April 1979, Lager and a Spring Grove woman named Bonnie Jones, in Kragness's presence, opened a bank account in Rochester, Minnesota, de-

---

**5.** Salvatore Aleto was named as a defendant in several counts of the indictment, but was a fugitive at the time of trial. Aleto employed a number of aliases, including Sam Houston, Ronald G. Myers, and Daniel Adame, Jr.

positing $39,000 (Canadian) that Kragness had brought from Colorado. In October 1979, after the second aborted La Junta drug run, Lager received about $57,000 (Canadian) from Kragness in Colorado, and deposited it in the Rochester account when he returned to Minnesota. Lager also deposited the $63,000 (Canadian) that he and Kragness smuggled out of Canada into this account. The total deposits to this account from its opening through its closing in August, 1981, in United States dollars, were about $171,000. In late 1979 or early 1980, Lager received $5,000 (Canadian) from Deters, deposited it in the account, and returned an equivalent sum in United States currency to Deters. From time to time, Lager disbursed to Kragness funds that Kragness had entrusted to him; in one instance the funds went towards the purchase of an airplane. Lager sometimes "laundered" the funds by passing them through an account he had with a securities firm. In late 1981, Lager and Kragness placed Alaskan property owned by Kragness in Lager's name, so that Kragness could avoid having to account for the wealth it represented.

### C. Cocaine and Quaalude Operations

The principal cocaine and quaalude operations involved in this case began in late 1979, when Aleto met Miami residents Anthony Benanti and Roland Sokol at a meeting in Denver, Colorado. Benanti testified that he and Sokol had a source of Colombian cocaine and quaaludes, Frank, Jose, and Nicholas Strusberg, but lacked an adequate means of transporting the drugs from Colombia. Aleto informed them that he had a friend with a plane and the ability to transport drugs from Colombia. A second meeting was held in Miami in early 1980, at which Benanti, Aleto, Deters, and Bobby Pucci (a Benanti associate) were present. At the meeting, it was arranged that Deters would fly to Colombia and return with a load of quaaludes. Meanwhile, in February 1980, Deters contacted Lager in Minne-

sota and asked him to find an airplane hangar in a specified area of Oklahoma. Lager did as requested, driving to Oklahoma and locating and renting two adjacent hangars at an airport in Anadarko. At about the same time, Deters rented a house in Chickasha, Oklahoma, eighteen miles from Anadarko. Deters told the owner of the house that he was renting it for "Carl Ryan"; at some later point, the owner met Jerald Holbrook, who identified himself as Carl Ryan. The house was rented for a little over a year, during which the owner saw it occupied at various times by Deters, Holbrook, and a number of other persons. This house and the Anadarko hangars were used as a base of operations for subsequent cocaine and quaalude flights.

The first flight took place in mid-April 1980. As arranged earlier, Deters served as pilot; Holbrook served as his co-pilot. Aleto, who was with Deters and Holbrook in Oklahoma, called Benanti in Miami when the plane left for Colombia. Benanti then called Sokol to let him know the plane was on its way. Sokol called Benanti back when the plane left Colombia. Deters and Holbrook arrived back in Oklahoma with eight cartons, each containing 25,000 quaaludes, and were met by Aleto. Not all of the quaaludes were of a salable grade. Part of the remainder was distributed to Houston, Texas,[6] and the rest were taken by Aleto to Benanti and Pucci in Baltimore, Maryland, where Benanti and Pucci distributed them.

A second flight took place in July, 1980. This flight was also preceded by planning meetings in Denver and Miami in which Benanti, Deters, and others participated. The operation went off much the same as the first, except that government witness Walter Schieche, rather than Holbrook, was the co-pilot. Schieche had been recruited to the operation by Deters. Twelve to fifteen cartons of quaaludes were brought back this time. Holbrook and Puc-

---

**6.** The government alleged that Ronald Prescott was the Houston purchaser of these quaaludes and of later consignments of cocaine and quaaludes. However, evidence concerning the role of defendant Prescott in these transactions is the subject of considerable dispute here, see, *infra*, Part VII. A., so we discuss it separately at the end of this section, *infra*, pp. 851–52.

ci transported eight cartons to Benanti in Baltimore, where Benanti and Pucci distributed them; the remainder went to Houston, Texas.

A third flight took place in the fall of 1980, this time with Holbrook and Schieche as pilots. This time, twelve cartons of quaaludes and twelve kilograms of cocaine were brought back from Columbia. After the plane landed in Oklahoma, the drugs were loaded into a pickup which Holbrook then drove to Dallas, Texas. Schieche and Deters, who had met the plane, went to Dallas the next day. There they met Holbrook, Benanti, Benanti associate Fabio Binetti, Frank Strusberg, and a Strusberg associate. Strusberg took a third of the drugs, Holbrook took a third, and Binetti took a third. Holbrook drove the cocaine he was given to California, where Benanti met him, took the cocaine, and sold it. Binetti delivered the drugs entrusted to him to Pucci in Atlanta.

Holbrook and Schieche were again the pilots on a fourth, and, as it turned out, final trip to Colombia, which took place in March 1981. This flight departed from an airport in Mount Vernon, Illinois, and on its return landed at an airport south of St. Louis, Missouri. Again, Holbrook and Schieche brought back twelve cartons of quaaludes and twelve kilograms of cocaine. Deters met the flight, and Holbrook took the drugs to St. Louis in a car while Deters and Schieche flew the plane to another airport. Deters, Binetti, Benanti, and Lager met Holbrook in St. Louis and divided the drugs. Binetti, Deters, and Holbrook each took possession of a third of the drugs. Binetti delivered the drugs entrusted to him to Pucci in New York. Holbrook again delivered the cocaine portion of the drugs he was given to Benanti in California, where Benanti sold it.

Deters gave his cocaine, which was contained in two briefcases, to Lager. Lager took it to Minnesota and then to South Dakota, where he awaited instructions. Shortly thereafter, Deters called Lager and instructed him to deliver part of the cocaine to Caspersen. Lager took one briefcase of cocaine to Caspersen's house, where he met Caspersen, Deters, and an unknown third man, to whom he saw Caspersen give the cocaine. Lager kept the other briefcase until May 1981, when he delivered it to Deters and another man in Dallas, Texas. In July 1981, at Deters's instance, Lager picked up money from Caspersen that Caspersen owed Deters for the cocaine he received; Lager delivered the money to Deters in Minnesota.

A fifth flight to Colombia was planned, but never took place. Holbrook and Schieche were again to serve as pilots. Deters and Benanti each fronted $50,000 to the Strusbergs in connection with the planned flight. The Strusbergs eventually reported that they could not obtain more drugs in Colombia. However, they did not return the $100,000 advance, but instead gave Deters and Benanti two kilograms of cocaine. Deters and Benanti distributed the cocaine to several customers.

A portion of Benanti's cocaine went to Binetti, who was later arrested in Baltimore on charges connected to this cocaine. Binetti cooperated with authorities, and this led to Benanti's arrest in June 1982. Benanti in turn agreed to cooperate with authorities by working as an undercover agent. From June 1982 to October 1983, Benanti tape-recorded a number of face-to-face meetings and phone conversations in which past and possible future drug activities were discussed. Portions of these recordings were introduced at trial, and Benanti testified that certain voices on the tapes were those of Deters and Holbrook. At several points in the tapes, the name Ron or Ronnie is mentioned in connection with past activities; Benanti testified that these were references to defendant Prescott.

The government alleged that Ronald Prescott was the Houston, Texas distributor of cocaine and quaaludes for the business. Evidence concerning Prescott came principally from Schieche and Benanti. Schieche testified that on his first flight to Colombia (which was the second Colombia flight overall), when he and Deters landed near Anadarko, they were met by Pucci and Holbrook, who then transported the

drugs from the run to Oklahoma City. The next day, Schieche traveled to Oklahoma City with Kragness's wife, Karen Kragness; there he briefly met with Deters, Holbrook, and Pucci in a hotel room, where they were engaged in sorting the quaaludes, removing those not of a salable grade. A fourth man whom Schieche did not know was also in the room, but did not handle the drugs in Schieche's presence. Some months later, just before Schieche's second flight (the third overall), he traveled with Deters to Dallas, where Deters was to meet a Houston man named "Ronnie" and arrange for Ronnie to take Deters's share of quaaludes from the upcoming flight. Schieche was not formally introduced to the man but saw Deters with him in the hotel lobby when the man checked out; Schieche recognized him as the fourth man in the Oklahoma City hotel room after the previous flight. Shortly after the man left, Deters told Schieche that the man in the lobby was Ronnie.

In early 1982, Schieche met Deters in Madison, Wisconsin. Deters informed Schieche that an IRS criminal investigation was afoot, and instructed him that, if asked, he should say that Deters and Benanti were in the exporting business. Deters then mentioned the name "Ronald Prescott"; in response to Schieche's question about whom he was referring to, Deters responded: "You remember Ronnie from Dallas, when we were in Dallas at the motel." Tr. 1515. Deters continued that the story as to Ronnie was that Deters was selling him oak flooring. Deters also told Schieche at some point that Ronnie was from Northern Minnesota. Tr. 1547–48. Prescott is in fact from Duluth, Minnesota, and, according to his brother, lived in Houston from about 1975 to 1985. Tr. 2782. At trial, Schieche identified Prescott as "[t]he person that looks most like the person I saw in the Dallas lobby," Tr. 1456; however, Schieche conceded on cross-examination that he could not identify Prescott from among the general population, but meant only that Prescott was the most similar among persons seated at the defense counsel table. Tr. 1682–83.

Benanti testified that sometime after the group's second flight to Colombia in July 1980, but before the third trip in the fall of that year, Deters told him that the Houston purchaser of their drugs was a man named Ron. Tr. 1768. Later in his testimony, Benanti stated that he met Ron Prescott in Miami, and that pursuant to business discussions they had then, he later sold Prescott cocaine on five or six occasions. Tr. 1772–74. The defense contends that the record establishes that Benanti's and Prescott's meeting occurred in 1983, and that therefore the sales occurred in 1983 or later, well after the last drug sales alleged in the indictment, while the government argues that they took place in 1981; we address this debate *infra*, Part VII. A.

Other testimony relevant to Prescott came from Mary Amundsen and from Lager. Amundsen, who is Deters's ex-wife, testified that she saw Prescott use cocaine once during a vacation the Deters and Prescott families took together in Florida in 1981. Tr. 1731–35. Lager testified that when he delivered the second briefcase of cocaine to Deters and another man in Dallas in May, 1981, see *supra*, p. 851, the other man was identified to him as Ron. However, Lager testified that he saw the man only very briefly, and at trial was unable to identify Prescott as the man he saw with Deters. Tr. 852.

### D. Arizona Marijuana Importation

In May 1981, Kragness telephoned Lager at his home in South Dakota and requested him to act as a transporter for a planned importation of drugs from Mexico into the Phoenix, Arizona area. Lager agreed and traveled to Colorado, where he met Kragness and Dennis Nelson, a friend of Dennis Deters's. These three then flew to Phoenix. Kragness explained to Lager the plan for the drug run, a plan Kragness and other participants said he had used before. A man called Eddie Roberts, whose real name was John Blackwell, was to pick up marijuana in Oaxaca, Mexico and drive it to a Mexican airport near the United States border. Nelson was to fly to this airport and return with the marijuana. Lager and various other persons would wait for Nel-

son at two alternate Arizona airports. When Nelson landed, the pick-up person would transport the marijuana to Roberts's ranch near Tucson.

This drug flight was eventually called off. Kragness and Nelson made a reconnaissance flight to the Mexican airport, and discovered that a number of Mexican federal police were present there. Nelson called Deters to discuss the problem, and, acting upon Deters's advice, decided not to make the drug run. The other participants then gave up on the trip and returned home.[7]

In late May 1981, Kragness again contacted Lager and requested that he go back to Arizona to participate in a drug run. This time Lager traveled to Colorado and met Martin Vinson, with whom he then flew to Phoenix. In Phoenix, Lager and Vinson met with Roberts and others, with whom they were to execute the same plan as on Lager's first trip to Arizona, except that Vinson was to be the pilot. On the appointed day, Lager went to one of the alternate return airports; he saw Vinson's plane fly over, but it did not land at his airport. Lager drove to Roberts's ranch, where he found the other participants, save for Vinson, and a quantity of marijuana. The marijuana was divided up and Lager then returned home, making part of the trip with a Canadian to whom part of the marijuana had been distributed.

In January 1982, Kragness asked Lager to go to Oaxaca, Mexico with Roberts and drive Roberts's pickup camper back carrying a load of marijuana. Lager and Roberts drove from Arizona to Oaxaca, and after they arrived, Roberts obtained a number of cannisters of marijuana which he loaded into his truck. On their way home, Roberts and Lager were stopped at a checkpoint by Mexican authorities, searched, and arrested when the marijuana was discovered. Lager spent from late January to mid-March 1982 in a Mexican prison. Kragness helped obtain Lager's release, apparently by arranging bribes of Mexican officials.

### E. The Indictment and Trial

As noted above, the appellants were tried on a thirteen-count indictment. Count I, a RICO conspiracy count, charged that Aleto and the appellants conspired to conduct or participate in the conduct of a drug enterprise's affairs through a pattern of racketeering activity; 49 overt acts were listed in the count. Count II, a substantive RICO count, charged the persons named in Count I with conducting or participating in the conduct of a drug enterprise's affairs through a pattern of racketeering activity. This count alleged 31 predicate acts of racketeering. Count III charged Vinson, Aleto, and all of the appellants except Prescott with conspiring to import marijuana. Count IV charged the persons named in Count III with a conspiracy to distribute marijuana. Count V charged Deters, Holbrook, and Aleto with conspiring to import cocaine and quaaludes, while Count VI charged Aleto and all of the appellants with conspiring to distribute cocaine and quaaludes.

Counts VII and VIII charged Deters with traveling in interstate commerce to promote unlawful activity. Count IX charged Deters and Holbrook with causing Lager to possess cocaine with intent to distribute it. Count X charged Kragness with using a telephone to facilitate marijuana exportation and distribution. Count XI charged Kragness with interstate travel to promote marijuana exportation and distribution. Count XII charged Kragness with causing the transportation of Canadian currency to the United States without reporting it. Finally, Count XIII charged Kragness with conspiring with Lager to obstruct the Internal Revenue Service in the collection of taxes.

The defendants' trial began September 18, 1985; the jury returned its verdict on October 21, 1985, after over four days of deliberations. Kragness was convicted on Counts I, II, III, IV, XI, XII, and XIII, and acquitted on Counts VI and X. Deters was

---

**7.** It was after Lager returned home from this trip that he delivered the second briefcase of

cocaine to Deters in Dallas, Texas.

convicted on Counts I through IX, all the counts charged against him. Caspersen was convicted on Counts I, II, and IV, but was acquitted on Counts III and VI. Prescott was convicted on Counts I and VI, but was acquitted on Count II. Finally, Vinson was acquitted on Counts III and IV, the only charges against him. The convicted defendants were sentenced on January 6, 1986 to concurrent sentences on each conviction. The longest sentence Kragness and Deters received for a conviction was twenty years, the longest for Caspersen and Holbrook was ten years, and the longest Prescott received was seven years.[8]

## II. RICO

We first take up the defendants' arguments concerning their RICO convictions. RICO makes it a crime "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). An "enterprise" is defined to "include[ ] any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). "Racketeering activity" is defined in 18 U.S.C. § 1961(1) as the commission of one of a number of specified state and federal crimes, commonly referred to as "predicate acts." The crimes specified include "the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in narcotic or other dangerous drugs, punishable under any law of the United States." A "pattern" of racketeering activity "requires at least two acts of racketeering activity." 18 U.S.C. § 1961(5).

The defendants assert that the District Court failed to give an adequate instruction upon RICO's enterprise requirement, that no enterprise was shown to exist, and that RICO's "pattern of racketeering activity" requirement was not met. Caspersen, Kragness, and Prescott further assert that the government failed to establish an adequate nexus between them and any enterprise or pattern of racketeering activity. Finally, Caspersen and Kragness contend that their convictions on Count II must be overturned because the indictment charged a single act of racketeering as two acts, permitting the jury to find the requisite two predicate acts of racketeering from what was actually only one act. For the most part we disagree with these contentions.

### A. The Enterprise Requirement

The enterprise alleged by the indictment here does not fall under the "legal entity" part of 18 U.S.C. § 1961(4)'s enterprise definition,[9] but is instead a "group of individuals associated in fact although not a legal entity." The Supreme Court, in *United States v. Turkette*, 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981), rejected arguments that a "completely illegal organization" such as the one here could not be a RICO enterprise. However, the Court was

8. The precise sentences the defendants received were as follows:

Kragness: Count I—20 years; Count II—20 years; Count III—5 years; Count IV—15 years; Count XI—5 years; Count XII—5 years; Count XIII—5 years.
Deters: Count I—20 years; Count II—20 years; Count III—5 years; Count IV—10 years; Count V—15 years; Count VI—15 years; Count VII—5 years; Count VIII—5 years; Count IX—5 years plus a 3-year special parole term.
Caspersen: Count I—10 years; Count II—10 years; Count IV—10 years.

Holbrook: Count I—10 years; Count III—5 years; Count IV—5 years; Count V—10 years; Count VI—10 years; Count IX—3 years plus a 3-year special parole term.
Prescott: Count I—7 years; Count VI—7 years.
As noted, all sentences were to be served concurrently.

9. There is no allegation that Deters Veneer and Lumber, a legal entity, was the RICO enterprise here.

careful to make clear that it is not enough in the case of such an "associational enterprise" simply to establish a pattern of racketeering activity.[10] Instead, "[t]he existence of an enterprise at all times remains a separate element which must be proved by the Government." *Id.* at 583. An enterprise is established "by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Ibid.* The enterprise "is an entity separate and apart from the pattern of [racketeering] activity in which it engages," *ibid;* see also *United States v. Anderson,* 626 F.2d 1358, 1365 (8th Cir.1980), *cert. denied,* 450 U.S. 912, 101 S.Ct. 1351, 67 L.Ed.2d 336 (1981), although the proof of these separate elements "may in particular cases coalesce." *Turkette,* 452 U.S. at 583, 101 S.Ct. at 2529. See generally *United States v. Riccobene,* 709 F.2d 214, 221–23 (3d Cir.), *cert. denied,* 464 U.S. 849, 104 S.Ct. 157, 78 L.Ed.2d 145 (1983).

■ Following *Turkette,* this Court in *United States v. Bledsoe,* 674 F.2d 647, 664–65 (8th Cir.), *cert. denied,* 459 U.S. 1040, 103 S.Ct. 456, 74 L.Ed.2d 608 (1982), identified three characteristics that distinguish a RICO enterprise: First, there must be a common or shared purpose that animates the individuals associated with it. Second, it must be an "ongoing organization" whose members "function as a continuing unit," *Turkette,* 452 U.S. at 583, 101 S.Ct. at 2528; in other words, there must be some continuity of structure and of personnel. Third, there must be an ascertainable structure distinct from that inherent in the conduct of a pattern of racketeering activity. See also, *United States v. Lemm,* 680 F.2d 1193, 1198 (8th Cir.1982), *cert. denied,* 459 U.S. 1110, 103 S.Ct. 739, 74 L.Ed.2d 960 (1983). Proof of all three of these characteristics is necessary in order to avoid the danger of guilt by association that arises because RICO does not require a proof of a single agreement as in a

conspiracy case, and in order to ensure that criminal enterprises, which are RICO's target, are distinguished from individuals who associate for the commission of sporadic crime. *Bledsoe,* 674 F.2d at 664–65; *Lemm,* 680 F.2d at 1198.

### 1. The Enterprise Instructions

The District Court's instructions to the jury contained the following statements concerning the enterprise requirement:

> You must find the existence of an enterprise, that is, as it applies to this case, a group of persons associated for the common purpose of dealing in narcotics or other dangerous drugs[.]

Tr. 3745.

> You must find that the defendant's participation in the affairs of the enterprise was through a pattern of racketeering activity which was separate from the acts that constitute the enterprise.

Tr. 3745–46.

> The term "enterprise" includes any group of individuals associated in fact, although not a legal entity.

Tr. 3747.

■ The defendants did not object to these instructions at trial; accordingly, as the defendants acknowledge, Brief of Appellant Kragness at 30, any deficiency in the instructions merits reversal only if it constitutes plain error. See Fed.R.Crim.P. 30; *United States v. Gantos,* 817 F.2d 41, 43 (8th Cir.), *petition for cert. filed,* No. 87–5101 (U.S. July 13, 1987). The defendants maintain that there is plain error here because the instructions permitted the jury to find an enterprise upon mere proof of a conspiracy. They also contend that the instructions allowed the jury to find an enterprise from the proof of predicate acts without more, rather than requiring them to find an entity separate from the pattern of racketeering activity.

---

10. Separating the enterprise from the pattern of racketeering is generally not problematic where a legal entity is involved, since "this entity is likely to be clearly distinct from the acts of racketeering." *Bennett v. Berg,* 685 F.2d 1053,

1060 n. 9 (8th Cir.1982), *aff'd in part and rev'd in part,* 710 F.2d 1361 (8th Cir.) (en banc), *cert. denied,* 464 U.S. 1008, 104 S.Ct. 527, 78 L.Ed.2d 710 (1983).

■ We disagree. First, we think it clear that the instructions required more than proof of a conspiracy, of an agreement among a group of individuals to do illegal acts. Instead, the instructions adequately address, at least for the purposes of plain-error review, the three characteristics of an enterprise listed by this Court in *Bledsoe*. The requirements of a common purpose and of a structure distinct from that inherent in the pattern of racketeering are expressly mentioned in the instructions. The instructions do not expressly mention the requirement of continuity of structure and personnel, but we think that use of the term "enterprise" itself implies that such continuity is contemplated. Although it might have been preferable to refer specifically to this factor in the instructions, omitting such a reference was not plain error.

■ The defendants argue that the instruction concerning the requirement of a structure distinct from the pattern of racketeering is deficient because it contains the words "acts that constitute the enterprise"; this, they assert, permitted an enterprise to be found from proof of predicate acts *simpliciter*. This is a misconstruction of the instruction, which, as it should, states precisely the opposite of what the defendants contend, requiring that an enterprise be established separately. The phrase "acts that constitute the enterprise" refers not to predicate acts, but to any acts that demonstrate the characteristics of an enterprise, *e.g.*, acts demonstrating that individuals associated with a putative enterprise occupy positions of command and subordination.[11] Accordingly, we conclude that there was no plain error in the District Court's enterprise instructions.

### 2. Sufficiency of the Enterprise Evidence

■ We further hold that there was sufficient evidence of each of the three enterprise characteristics for a jury to find that an enterprise existed. First, it is abundantly clear that the common-purpose element was present here. Each defendant shared the common purpose alleged in the indictment, to import, receive, conceal, buy, sell, and otherwise deal in narcotic and dangerous drugs, and each to some extent carried out this purpose. See *Lemm*, 680 F.2d at 1199.

■ Next, the requisite continuity of structure and of personnel has also been demonstrated. Continuity of structure exists where there is an organizational pattern or system of authority that provides a mechanism for directing the group's affairs on a continuing, rather than an ad hoc, basis. *Bledsoe*, 674 F.2d at 665; *Lemm*, 680 F.2d at 1199; *Riccobene*, 709 F.2d at 222. The continuity-of-personnel element involves a closely related inquiry, in which "[t]he determinative factor is whether the associational ties of those charged with a RICO violation amount to an organizational pattern or system of authority." *Lemm*, 680 F.2d at 1199, citing *Bledsoe*, 674 F.2d at 665; see *Riccobene*, 709 F.2d at 223. The continuity of these elements need not be absolute; the group's system of authority may be modified, old members may leave, and new members may join. *Bledsoe*, 674 F.2d at 665; *Lemm*, 680 F.2d at 1199;[12] *Riccobene*, 709 F.2d at 222–23. That some changes in structure and personnel occur does not mean that there is no mechanism for continuing direction of group affairs; both the structure and the personnel of an enterprise may undergo alteration without loss of the enterprise's identity as an enterprise.

■ As one might expect, both the structure of and the personnel associated with the organization here underwent some

---

**11.** Of course, proof of predicate acts is one sort of evidence that may establish one of the characteristics of an enterprise; as *Turkette* points out, 452 U.S. at 583, 101 S.Ct. at 2528, proof of the enterprise and of the pattern of racketeering may "coalesce."

**12.** *Lemm* does not, as the defendants argue, hold that an unchanging pattern of roles is necessary to establish structural continuity. Instead, *Lemm* holds only that "structural continuity exists where an unchanging pattern of roles is necessary and is utilized to carry out the predicate acts," 680 F.2d at 1199. But this says only that an unchanging pattern of roles is sufficient, not that it is necessary to establish structural continuity.

changes during the course of its various activities. Nonetheless, the activities of the group exhibit a pattern of roles and a continuing system of authority; the essential identity of the enterprise endured. Kragness, Deters, Holbrook, Caspersen, and Lager were all members of the organization from at least 1979 until it ceased operations. Other participants in the organization's drug activities came and went, and there was a significant expansion of the operation with the addition of Benanti and his associates in the cocaine-and-quaalude project, but the core group remained involved throughout.

Kragness and Deters occupied positions of authority, arranging and directing the group's drug importation and distribution. They recruited and assigned personnel, oversaw the provision of logistical and materiel requirements, such as airfields and planes, and provided and organized financial backing. Both Kragness and Deters personally performed more low-level tasks, such as piloting planes on drug runs, during the early days of their involvement in the drug business, and progressed to perform more "hands-off" supervisory roles. Caspersen and Prescott performed distribution functions throughout the course of their involvement in the business; Caspersen provided a "safe house" for drugs and distributed marijuana and cocaine, and Prescott distributed quaaludes and cocaine. Lager was recruited by Kragness to act as a "transporter," and performed this role throughout his involvement; he also performed the tasks of finding both the La Junta and Anadarko airstrips, and performed banking functions throughout the course of the enterprise. Holbrook also acted as a transporter, and assisted in flying both Mexican marijuana flights and Colombian cocaine-and-quaalude trips. Others in the business also played consistent roles, e.g., Schieche acted as a pilot on a number of flights to Colombia. In addition to the activities of the participants, further evidence of the existence and structure of this organization is provided by a number of statements that participants made to other persons; for example, Kragness once stated to a girlfriend that he

objected to the use of drugs by anyone in "his organization." Tr. 559 (Testimony of Rita O'Flaherty). We therefore conclude that there was sufficient evidence of continuity of structure and of personnel.

Lastly, we hold that there was also sufficient evidence of an ascertainable structure distinct from the pattern of racketeering activity. As the Third Circuit has observed, to establish this element,

> it is not necessary to show that the enterprise has some function wholly unrelated to the racketeering activity [such as a legitimate line of business], but rather that it has an existence beyond that which is necessary merely to commit each of the acts charged as predicate racketeering offenses. The function of overseeing and coordinating the commission of several different predicate offenses and other activities on an on-going basis is adequate to satisfy the separate existence requirement.

*Riccobene*, 709 F.2d 223–24. See *Bledsoe*, 674 F.2d at 665. For example, in *United States v. Lemm, supra*, a case which involved an arson ring, we found that the enterprise had not impermissibly been found from the predicate acts where, if the predicate acts of mail fraud were all put to one side, there was still evidence of other legal and illegal acts, such as legitimate purchases and repairs of property and acts of arson, that showed an on-going structure. 680 F.2d at 1201.

Here there was evidence of a number of activities aside from the commission of the alleged predicate acts that demonstrate that the enterprise had an on-going structure, and that its members were not simply engaged in sporadic, ad hoc criminal activity. The organization made investments in its criminal future, such as purchasing the La Junta property, acquiring planes that were suitable for drug flights to Mexico, and renting the Anadarko hangars and the Chickasha house; these assets were not exhausted with a single drug run, but were used repeatedly over the course of a number of criminal episodes. The various banking and financial services performed by Lager are further nonpredicate-act evi-

dence of the organization's on-going structure.

In sum, we conclude that there was sufficient evidence of each of the three characteristics of an enterprise enumerated in *Bledsoe* to support the jury's conclusion that an enterprise existed.

### B. Pattern of Racketeering Activity

It is implicit in RICO's definition of "pattern of racketeering activity" to "require[ ] *at least* two acts of racketeering activity," 18 U.S.C. § 1961(5) (emphasis added), that "while two acts are necessary, they may not be sufficient." *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496 n. 14, 105 S.Ct. 3275, 3285 n. 14, 87 L.Ed.2d 346 (1985). "[T]wo isolated acts of racketeering activity do not constitute a pattern," nor do "one 'racketeering activity' and the threat of continuing activity." *Ibid.* Instead, *"continuity plus relationship"* between the predicate acts is necessary to establish a pattern. *Ibid.,* quoting S.Rep. No. 91–617, 91st Cong., 1st Sess. 158 (1969) (emphasis added).

Following the Supreme Court's decision in *Sedima,* this Court has held that where all the predicate acts were committed in furtherance of a single "scheme," there is not sufficient continuity among the acts to meet the pattern requirement. *E.g., Superior Oil Co. v. Fulmer,* 785 F.2d 252, 257–58 (8th Cir.1986); *Holmberg v. Morrisette,* 800 F.2d 205, 209–10 (8th Cir.1986), *cert. denied,* — U.S. —, 107 S.Ct. 1953, 95 L.Ed.2d 526 (1987). In both *Superior Oil* and *Holmberg* we held that several related acts of mail and wire fraud that were part of a single criminal effort did not constitute a pattern; we observed that " '[i]t places a real strain on the language to speak of a single fraudulent effort, implemented by several fraudulent acts, as a "pattern of racketeering activity." ' " *Superior Oil,* 785 F.2d at 257 (footnote omitted), quoting *Northern Trust Bank, N.A. v. Inryco, Inc.,* 615 F.Supp. 828, 831 (N.D.Ill.1985); *Holmberg,* 800 F.2d at 210. We note that the Seventh Circuit has rejected *Northern Trust Bank* 's holding that no pattern is shown where the predicate acts were committed as part of a single scheme, see

*Morgan v. Bank of Waukeegan,* 804 F.2d 970, 973–77 (7th Cir.1986); see also *United States v. Ianniello,* 808 F.2d 184, 189–93 (2d Cir.1986), *cert. denied,* — U.S. —, 107 S.Ct. 3230, 97 L.Ed.2d 736 (1987) (rejecting two-scheme requirement); *Bank of America v. Touche Ross & Co.,* 782 F.2d 966, 971 (11th Cir.1986) (same), but this of course does not alter the law in our Circuit.

■ Here we think it clear that even our more restrictive view of the pattern requirement has been met, for there is evidence of not two but three separate schemes: first, there was a scheme to import marijuana into La Junta; second, there was a cocaine-and-quaalude scheme; and third, there was a scheme to import marijuana into the Phoenix area. The cocaine-and-quaalude project constitutes a separate scheme because, *inter alia,* it involved drugs different from that in the other schemes, a different drug supplier from a different country, a different United States base of operations (Anadarko/Chickasha), different customers, and the participation of a number of persons, such as Benanti and his associates, who were not involved in the marijuana schemes. While the La Junta and Phoenix schemes both involved marijuana from Oaxaca, Mexico, they nonetheless were separate schemes. They involved different United States bases of operation and different methods of smuggling the marijuana into the country (the La Junta marijuana was generally flown directly from Oaxaca to the United States, while the Phoenix marijuana was first driven to a point near the United States border). Further, there were a number of participants in each scheme who took no part in the other. Finally, the two schemes were separated by a substantial period of time; the last La Junta-based drug activities were in early 1981, while the earliest Phoenix activities were in mid–1982. We consequently have little difficulty in concluding that the pattern requirement was met here.

### C. Defendants' Links to the RICO Violations

#### 1. Caspersen and Kragness

Caspersen and Kragness, who were convicted on both the RICO-conspiracy count

(Count I) and the substantive RICO count (Count II), each claim the government failed to demonstrate an adequate nexus between them and any enterprise or pattern of racketeering activity. RICO, they stress, makes it unlawful for "any *person* ... to conduct or participate ... in the conduct of [an] enterprise's affairs *through a pattern of racketeering activity.*" 18 U.S.C. § 1962(c) (emphasis added). They contend that to meet this standard, it must be shown that the individual defendant engaged in a pattern of racketeering activity by personally and directly taking part in two different schemes.

■ We doubt that it is necessary for each defendant to be personally and directly engaged in two different schemes (though the enterprise must be), given that the statute requires only that one "participate, directly or indirectly, in the conduct of [the] enterprise's affairs through a pattern of racketeering activity." See *infra* pp. 859–860. Even were we to accept this proposition, it would be of no avail to Kragness and Caspersen, for they each participated directly in two different schemes conducted by the enterprise.

■ Kragness asserts that there is no evidence that he had any truck with the cocaine-and-quaalude project.[13] This, even if true, makes no difference, since Kragness participated in both of the marijuana schemes we have identified, *supra* pp. 6–9 and 14–16. As for Caspersen, there is evidence that he participated in the La Junta marijuana scheme and in the cocaine-and-quaalude scheme. Caspersen objects that evidence of his participation in the cocaine-and-quaalude project may not be considered in assessing the validity of his RICO convictions because to do so would be inconsistent with his acquittal on Count VI, which charged him with conspiracy to distribute cocaine and quaaludes.[14] However, inconsistency between verdicts on separate counts of an indictment does not entitle a defendant to reversal of a conviction on insufficient-evidence grounds. *United States v. Powell,* 469 U.S. 57, 68–69, 105 S.Ct. 471, 478–79, 83 L.Ed.2d 461 (1984); *Dunn v. United States,* 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356 (1932); *United States v. Bryant,* 766 F.2d 370, 376 (8th Cir.1985), *cert. denied,* 474 U.S. 1054, 106 S.Ct. 790, 88 L.Ed.2d 768 (1986).[15] Evidence of Caspersen's cocaine activities, together with evidence of his role in the La Junta scheme, is sufficient to support his RICO conviction.

### 2. Prescott

Prescott was acquitted on Count II, which charged a violation of 18 U.S.C. § 1962(c), but was convicted on Count I, which charged a conspiracy to violate 18 U.S.C. § 1962(c), a violation of 18 U.S.C. § 1962(d).

There is a split of authority among the circuits as to whether a § 1962(d) conspir-

---

13. Kragness correctly points out that virtually all of the evidence concerning cocaine and quaaludes was excluded as to him, and that, in any case, no evidence showed that he participated directly in the project. The only evidence linking him to the cocaine-and-quaalude scheme is Lager's testimony that, at Kragness's request, he once retrieved a trailer Kragness owned from one of the Anadarko hangars, testimony that Kragness's wife, Karen Kragness, was present in Anadarko during some of the drug activities, and records of telephone traffic between Anadarko/Chickasha phones and Kragness's phones.

14. Caspersen also cites his acquittal on Count III's conspiracy to import marijuana charge, but his conviction on Count IV's conspiracy to distribute marijuana charge firmly establishes that the jury found that he was involved in the La Junta project.

15. The inconsistent verdict here does not establish that the jury was not convinced that Caspersen participated in the cocaine scheme; instead, "[i]t is equally possible that the jury, convinced of guilt, properly reached its conclusion on the [RICO] offense[s], and then through mistake, compromise, or lenity, arrived at an inconsistent conclusion on the lesser offense." *United States v. Powell,* 469 U.S. 57, 65, 105 S.Ct. 471, 477, 83 L.Ed.2d 461 (1985). We cannot discern what the jury "really meant" in such cases; given the government's inability to invoke review on similar grounds, general reluctance to inquire into the workings of the jury, and the possibility that the jury exercised lenity, the Supreme Court has concluded that the best course is to insulate verdicts from attack on this ground. *Id.* at 68–69, 105 S.Ct. at 478–79.

acy to violate § 1962(c) requires that one agree personally to commit at least two predicate crimes, a view espoused by two circuits,[16] or whether it is instead sufficient, as six circuits have held,[17] to agree to the commission of two or more predicate crimes by coconspirators. This Court expressly reserved judgment on this issue in *Lemm*, 680 F.2d at 1203 n. 11. Under the mode of analysis established by our definition of "pattern of racketeering activity" in *Superior Oil, supra*, to require two racketeering "schemes," the question is whether it is necessary that a defendant agree personally to take part in two schemes, or whether it is sufficient that he agree to the perpetration of two schemes by coconspirators. Here, if the former is the law, then Prescott's conviction must be overturned, for there is no evidence that he ever agreed to participate in any scheme other than the cocaine and quaalude scheme.

 However, we agree with the majority of the other circuits that RICO conspiracy law, like traditional conspiracy law, requires only that each defendant agree to join the conspiracy, not that he agree to commit each of the acts that would achieve the conspiracy's objective. The terms Congress employed in the statute are expansive; it speaks not just of "conduct[ing]," but also of "participat[ing], directly or indirectly, in the conduct ... through a pattern of racketeering activity." As other circuits have observed, the statute does not explicitly require an agreement personally to commit predicate acts, and such a narrow construction would not square with the congressional purpose in RICO of broadening the remedies available to combat organized crime. See *United States v. Neapolitan*, 791 F.2d at 495–96; *United States v. Carter*, 721 F.2d at 1528–29.

 The problem here thus becomes whether there is evidence sufficient to support a jury finding that Prescott agreed that others associated with the enterprise would engage in one or both of the marijuana schemes, schemes in which he did not personally participate. There is no substantial evidence that Prescott knew of either scheme. His conviction on Count I (RICO conspiracy) must therefore be reversed for lack of sufficient evidence.

### D. Divided Predicate Acts

Caspersen and Kragness maintain that the verdict against them on Count II is fatally ambiguous because the indictment charged two predicate acts, acts 10(a) and 10(b), that were in fact a single act.[18] Act 10(a) alleged that, on or about December 22, 1979, Kragness, Caspersen, Deters, and Aleto imported marijuana from Mexico to the United States, violating 21 U.S.C. § 952(a). Act 10(b) alleged that on the same date, Kragness, Caspersen, and Aleto possessed marijuana with intent to distribute it, violating 21 U.S.C. § 841(a)(1). Kragness and Caspersen assert that 10(a) and 10(b) both refer to one act, bringing a single shipment of marijuana into the United States from Mexico, that simultaneously violated two statutes. This, they continue, means that the jury may have found the two predicate acts necessary to a RICO violation from what was actually only one act.

---

**16.** See *United States v. Ruggiero*, 726 F.2d 913, 921 (2d Cir.), *cert. denied*, 469 U.S. 831, 105 S.Ct. 118, 83 L.Ed.2d 60 (1984); *United States v. Winter*, 663 F.2d 1120, 1136 (1st Cir.1981), *cert. denied*, 460 U.S. 1011, 103 S.Ct. 1250, 75 L.Ed.2d 479 (1983).

**17.** *United States v. Rosenthal*, 793 F.2d 1214 (11th Cir.1986), *cert. denied*, — U.S. —, 107 S.Ct. 1377, 94 L.Ed.2d 692 (1987); *United States v. Neapolitan*, 791 F.2d 489 (7th Cir.) *cert. denied*, — U.S. —, 107 S.Ct. 422, 93 L.Ed.2d 372 (1986); *United States v. Joseph*, 781 F.2d 549 (6th Cir.1986); *United States v. Adams*, 759 F.2d 1099, 1116 (3d Cir.), *cert. denied*, 474 U.S. 971, 106 S.Ct. 336, 88 L.Ed.2d 321 (1985); *United States v. Tille*, 729 F.2d 615, 619 (9th Cir.), *cert. denied*, 469 U.S. 845, 105 S.Ct. 156, 83 L.Ed.2d 93 (1984); *United States v. Carter*, 721 F.2d 1514, 1528–31 (11th Cir.), *cert. denied*, 469 U.S. 819, 105 S.Ct. 89, 83 L.Ed.2d 36 (1984).

**18.** The defendants also contend that acts 11(a) and 11(b) are similarly defective. However, as Caspersen observes, Brief of Appellant Caspersen at 10, the government adduced no evidence concerning acts 11(a) and 11(b). We are therefore confident that the jury did not rely on 11(a) and 11(b) in reaching its verdict, and any error involved in charging these as two predicate acts is harmless.

■ We agree with the defendants that it is not proper under RICO to charge two predicate acts where one action violates two statutes.[19] A pattern of racketeering activity requires "at least two *acts* of racketeering," 18 U.S.C. § 1961(5) (emphasis added), not "at least two statutory offenses." We do not think that the factor of " *'continuity plus relationship,'* " *Sedima*, 473 U.S. at 496 n. 14, 105 S.Ct. at 3285 n. 14, quoting S.Rep. No. 91–617, 91st Cong., 1st Sess. 158 (1969) (emphasis added), which Congress thought necessary to establish a pattern, can be present where only a single act, albeit an act that violates two statutes, has been committed. See *United States v. Phillips*, 664 F.2d 971, 1038–39 (5th Cir. Unit B 1981), *cert. denied*, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982); *but see United States v. Bascaro*, 742 F.2d 1335, 1360–61 (11th Cir.1984), *cert. denied*, 472 U.S. 1017, 105 S.Ct. 3476, 87 L.Ed.2d 613 (1985).[20]

■ Any error involved in charging 10(a) and 10(b) as separate predicate acts is harmless as to Kragness because he was convicted on Count XI, which charged a substantive offense identical to Count II's predicate act 10(d). Count XI and act 10(d) both allege that on or about December 26, 1979, Kragness traveled in interstate commerce, from Minnesota to Washington, for the purpose of promoting trafficking in marijuana, a violation of 18 U.S.C. § 1952(a). Having convicted Kragness on Count XI, the jury must have found that he committed act 10(d); therefore, it is clear that the jury did not find the requisite two predicate acts from acts 10(a) and 10(b) alone.

■ As to Caspersen, however, our analysis requires a different conclusion. Although evidence of many other predicate acts was strong, we cannot know from the jury's general verdict of guilty which acts it found Caspersen had committed. There is a possibility that his conviction is based on a finding that he committed acts 10(a) and 10(b), but no others. As a practical matter, this seems most unlikely, but in a criminal case a conviction may not be upheld on the basis of speculation or inference, however strong, of this kind. It is the jury that must convict, not an appellate court. If the instructions leave open the logical possibility that the verdict is based on a legally insufficient predicate, the conviction cannot stand. That is the case here, and Caspersen's conviction on Count II (substantive RICO) must be reversed.

III. Misjoinder, Severance, and Variance

Defendants Caspersen and Kragness assert that their convictions must be reversed under Fed.R.Crim.P. 8(b) because joinder of the defendants was improper on the face of the indictment. Rule 8(b) provides that two defendants may be charged "in the same act or transaction or in the same series of acts or transactions." It is not necessary that every defendant have participated in or be charged with each offense in the indictment, but there must be "some common activity involving all of the defendants which embraces all the charged offenses." *United States v. Bledsoe*, 674 F.2d 647, 656 (8th Cir.1982).[21]

19. This is by no means to say that it would be improper to charge separate predicate offenses where two different acts committed during the course of a "single episode" or "single transaction" violate two statutes.

20. Indeed, this aspect of the indictment appears to run afoul of the Justice Department's own guidelines for charging separate predicate acts. Observing that "[t]his is a, gray area with no clear-cut rules," the Justice Department's manual for RICO prosecutions states, "approval [of a proposed RICO count] will not be granted where the pattern as to any one defendant includes both importation and possession with intent to distribute with respect to the same load of narcotics." U.S. Department of Justice, Crim-

inal Division, *Racketeer Influenced and Corrupt Organizations (RICO): A Manual for Federal Prosecutors* 47–48 (1985); U.S. Department of Justice, Criminal Division, *Racketeer Influenced and Corrupt Organizations (RICO): A Manual for Federal Prosecutors* 51 (1st Revised Ed. 1986).

21. The defendants argue that misjoinder under Rule 8(b) is *per se* reversible error; while that was once the law of this Circuit, *United States v. Bledsoe*, 647 F.2d at 657–58, the Supreme Court has now made clear that harmless-error doctrine applies to Rule 8(b) violations. *United States v. Lane*, 474 U.S. 438, 106 S.Ct. 725, 729–32, 88 L.Ed.2d 814 (1986); *United States v.*

■ We think joinder was proper on the face of this indictment. The defendants were all named together in the RICO and RICO-conspiracy counts (Counts I and II), and the various drug conspiracies charged in the indictment (Counts III–VI) were part and parcel of the RICO violations. The defendants' chief argument is that the remaining seven counts were improperly joined. However, it is obvious that the three counts charging interstate travel to promote drug trafficking by Deters (Counts VII and VIII) or by Kragness (Count XI), the count charging Deters and Holbrook with causing Lager to possess cocaine (Count IX), and the count charging Kragness with using a telephone to promote drug trafficking (Count X), all involved offenses embraced within the defendants' common RICO activity. The only counts that even superficially appear unrelated to the common activity are Counts XII and XIII, which, respectively, charge Kragness with causing the unreported importation of Canadian currency and with conspiring to evade income taxes. But the indictment alleges that the funds involved were proceeds of or otherwise connected with the defendants' racketeering activity. See Count I, Overt Act 24; Count XII; Count XIII & Overt Act 6. Even were these crimes not sufficiently connected to the defendants' common activity to justify joinder, the error would be harmless, since evidence of Kragness's illicit profits would have been relevant to the RICO and drug conspiracies, and would therefore have been admissible here anyway. See *United States v. Lueth,* 807 F.2d 719, 730 (8th Cir.1986).

■ The defendants next assert that, once trial began, it became clear that joinder was prejudicial, and that severance should have been granted under Fed.R. Crim.P. 14. Rule 14 provides the trial court with discretion to grant a severance when it believes the defendants or the government may be prejudiced by joinder. Our review of the trial court's decision is for an abuse of discretion. *United States v. Lane,* 474 U.S. 438, 106 S.Ct. 725, 732 n.

*Lueth,* 807 F.2d 719, 729–30 & n. 6 (8th Cir.

12, 88 L.Ed.2d 814 (1986); *Lueth,* 807 F.2d at 730–31.

■ Here, the defendants have not shown the "clear prejudice" necessary to establish that the District Court abused its discretion. See *United States v. Mansaw,* 714 F.2d 785, 790 & n. 5 (8th Cir.), *cert. denied,* 464 U.S. 986, 104 S.Ct. 434, 78 L.Ed.2d 366 (1983). The evidence on the common counts was not so much more damaging against some defendants than others as to raise fears that the "jury could not reasonably be expected to compartmentalize the evidence as it relates to separate defendants." *United States v. Knife,* 592 F.2d 472, 480 (8th Cir.1979) (citations omitted). Nor did the counts charging only one or two defendants, such as the interstate-travel counts, involve crimes of a more serious or inflammatory nature that might have produced a "spill-over" effect. Indeed, we see strong proof that the jury was able to compartmentalize the evidence in the fact that, after much of the cocaine and quaalude evidence was admitted with the instruction that it was not to be considered as to Kragness, the jury acquitted Kragness on the only exclusively cocaine-and-quaalude count (Count VI) in which he was charged.

■ The defendants also argue that the evidence here did not establish an overall agreement to violate RICO, but instead showed only three "regional" conspiracies (corresponding to the three schemes we identify in our discussion of the RICO "pattern" requirement, Part II. B., *supra*), with overlapping members. This, they continue, means that there was a prejudicial variance between the indictment and the proof at trial, see *Kotteakos v. United States,* 328 U.S. 750, 755–56, 66 S.Ct. 1239, 1243, 90 L.Ed. 1557 (1946), and also affects the issue of joinder, for if there was no overall RICO agreement, there was no common activity embracing the various other crimes charged. See *id.* at 774–75, 66 S.Ct. at 1252–53; *Lane,* 106 S.Ct. at 730–31. This argument is largely a reiteration of the contentions addressed in Part II. C.,

1986).

*supra,* that no adequate nexus was shown between various defendants and the enterprise or pattern of racketeering. As we view the evidence, while a jury might have concluded that the different schemes were not connected, the evidence was more than adequate to support a finding that Kragness, Caspersen, Deters, Prescott, and Holbrook were parties to an overall agreement to engage in the various schemes.

### IV. Double Jeopardy

The defendants next contend that the Double Jeopardy Clause of the Fifth Amendment prohibits their conviction for both Count I's RICO-conspiracy charge and the various drug conspiracies charged in Counts III–VI. We disagree.

■ The Double Jeopardy Clause protects against a second prosecution for the same offense after an initial acquittal, against a second prosecution for the same offense after a conviction, and, in its aspect which is relevant here, against multiple punishments for a single offense. *North Carolina v. Pearce,* 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969). The test for determining whether two offenses are the "same" for double-jeopardy purposes was announced in *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932), which stated:

The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.

Since *Blockburger,* the Supreme Court has repeatedly emphasized that, at least in cases where cumulative punishments are imposed in a single prosecution, the *Blockburger* rule is a tool of statutory construction used to determine legislative intent rather than a constitutional "litmus test" that imposes a conclusive presumption of law. See, *e.g., Garrett v. United States,* 471 U.S. 773, 778–79, 105 S.Ct. 2407, 2411–12, 85 L.Ed.2d 764 (1985); *Missouri v. Hunter,* 459 U.S. 359, 366, 103 S.Ct. 673, 678, 74 L.Ed.2d 535 (1983). In this context,

the Double Jeopardy Clause serves only to prevent courts from imposing greater punishment than the legislature has provided for:

[T]he question of what punishments are constitutionally permissible is not different from the question of what punishments the Legislative Branch intended to be imposed. Where Congress intended, as it did here, to impose multiple punishments, imposition of such sentences does not violate the Constitution.

*Albernaz v. United States,* 450 U.S. 333, 344, 101 S.Ct. 1137, 1145, 67 L.Ed.2d 275 (1981). On the other hand, "where the offenses are the same under [the *Blockburger*] test, cumulative sentences are not permitted, unless elsewhere specially authorized by Congress." *Whalen v. United States,* 445 U.S. 684, 693, 100 S.Ct. 1432, 1438, 63 L.Ed.2d 715 (1980).

■ The government asserts that the RICO-conspiracy charge and the non-RICO drug-conspiracy charges each require proof of a fact or an element that is not a part of the other. First, the government correctly observes that the RICO-conspiracy charge requires proof that the defendants agreed to employ an "enterprise" and to the conduct of its affairs through a "pattern of racketeering," requirements not present in the drug-conspiracy charges. Second, citing *United States v. Thomas,* 757 F.2d 1359, 1370–71 (2d Cir.) *cert. denied,* 474 U.S. 819, 106 S.Ct. 66, 88 L.Ed.2d 54 (1985), the government argues that the drug conspiracies require proof of a fact not necessary to the RICO conspiracy because they require proof of an agreement to violate narcotics laws; while an agreement to violate narcotics laws could fulfill the RICO "pattern of racketeering" requirement, it is not necessary, since there are many other possible predicate crimes under RICO. See 18 U.S.C. § 1961(1).

We must disagree with this last argument, because it is inconsistent with the Supreme Court's opinion in *Whalen, supra,* 445 U.S. at 694, 100 S.Ct. at 1439. The government argued in *Whalen* that a rape charge and a felony-murder charge predicated upon the rape were not the same

offense because felony murder under the statute in question did not in all cases require proof of a rape, but could also be made out where one of several other offenses, such as arson, was present. The Supreme Court rejected this argument, holding that because proof of the felony murder before it in fact rested upon proof of the rape, the two were the same offense. Here, proof of the RICO conspiracy in fact rested upon proof of the drug conspiracies, and not upon proof of an agreement that some other predicate offenses would be committed.

While we thus conclude that the offenses are the same under *Blockburger*, the question remains whether Congress nonetheless intended to allow multiple punishments for RICO conspiracies and conspiracies to commit the underlying predicate offenses. Like other courts that have addressed this question, we conclude that Congress fully intended to permit cumulative punishments. See, *e.g., United States v. Hampton*, 786 F.2d 977, 980 (10th Cir.1986), and *United States v. Sutton*, 700 F.2d 1078, 1080–81 (6th Cir.1983).

■ RICO was enacted as Title IX of the Organized Crime Control Act of 1970, Pub.L. No. 91–452, 84 Stat. 922. The introductory section of the Organized Crime Control Act states:

It is the purpose of this Act to seek the eradication of organized crime in the United States by strengthening the legal tools in the evidence-gathering process, by establishing *new* penal prohibitions, and by providing *enhanced sanctions* and new remedies to deal with the unlawful activities of those engaged in organized crime.

84 Stat. 923 (emphasis added). Further, Congress specifically provided in RICO that "[n]othing in [RICO] shall supersede any provision of Federal ... law imposing criminal penalties ... in addition to those provided for in [RICO]." Pub.L. No. 91–452, § 904(b), 84 Stat. 947. We see "nothing in the RICO statutory scheme which would suggest that Congress intended to preclude separate convictions," *United States v. Rone*, 598 F.2d 564, 571 (9th Cir.1979), *cert. denied*, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980). Instead, we conclude that Congress clearly intended to permit, and perhaps sought to encourage, the imposition of cumulative sentences for RICO offenses and the underlying crimes. *Sutton*, 700 F.2d at 1081; *United States v. Truglio*, 731 F.2d 1123, 1129 (4th Cir.), *cert. denied*, 469 U.S. 862, 105 S.Ct. 197, 83 L.Ed.2d 130 (1984).

We therefore hold that the defendants' convictions for RICO conspiracy and for one or more drug conspiracies do not offend the Double Jeopardy Clause.

### V. Lager's Credibility

■ Kragness and Caspersen contend that there was insufficient evidence against them on the RICO counts and the drug conspiracies for which they were convicted because the government's case rested in large measure upon the testimony of Richard Lager, testimony which they term "obviously incredible." They also note that there were inconsistencies in Lager's testimony. Kragness and Caspersen observe that Lager was an accomplice and coconspirator who testified under a grant of immunity, and that Lager admitted that he perjured himself before the grand jury that investigated this case. Finally, they note that Lager suffered a head injury in the early 1970s that caused memory loss and an inability to concentrate.

"[Q]uestions as to the credibility of witnesses and as to the weight to be given their testimony are for the jury and not for the reviewing court." *United States v. Wilkerson*, 691 F.2d 425, 427 (8th Cir.1982) (citations omitted). Here, our review of Lager's testimony and of the rest of the record persuades us that Lager's testimony was not so incredible or insubstantial that no reasonable juror would have credited it.

While "[t]he testimony of an accomplice is not per se unreliable," *United States v. Evans*, 697 F.2d 240, 245 (8th Cir.), *cert. denied*, 460 U.S. 1086, 103 S.Ct. 1779, 76 L.Ed.2d 350 (1983), and a conviction may be upheld based solely upon such evidence, *United States v. Anderson*, 654 F.2d 1264, 1268 (8th Cir.), *cert. denied*, 454 U.S. 1127

102 S.Ct. 978, 71 L.Ed.2d 115 (1981), here, Lager's testimony was corroborated in numerous respects by a variety of documentary and testimonial evidence. The inconsistencies adverted to by the defendants generally concern particular dates upon which events occurred; in the context of Lager's entire testimony, and given that he testified long after the events in question, these were not such major flaws that his testimony was unbelievable. As for Lager's perjury before the grand jury, it consisted principally of efforts by Lager to avoid implicating his friends and coconspirators, particularly Kragness; indeed, at one point Lager was jailed for contempt because he refused to testify against his coconspirators. Finally, and most importantly, the defendants were able to and did bring these and other matters reflecting upon Lager's credibility before the jury; while they might have led the jury to find Lager not credible, they do not make his testimony so legally infirm or insubstantial as to establish reasonable doubt as a matter of law. See *Evans*, 697 F.2d at 245; *Williams v. United States*, 328 F.2d 256, 259 (8th Cir.), *cert. denied*, 377 U.S. 969, 84 S.Ct. 1651, 12 L.Ed.2d 739 (1964).

## VI. Deters's Conviction on Count VII

■ Deters asserts that there is not sufficient evidence to support his conviction on Count VII, which charged that on or about August 16, 1980, Deters traveled in interstate commerce, from Minnesota to Florida, for the purpose of promoting drug trafficking, a violation of 18 U.S.C. § 1952(a). The government introduced credit-card records and an airline-ticket stub which show that Deters traveled from Minneapolis/St. Paul to Miami on August 16, 1980, P.Ex. 2Y, and Deters concedes that he made this trip. However, Deters maintains, and our examination of the record persuades us to agree, that the government introduced no evidence to show that the purpose of this trip was to promote unlawful activity.

The government asserts that testimony from Benanti concerning two trips Deters made to Miami in 1980 to plan drug flights to Colombia establishes that the August 16, 1980 trip was to promote unlawful activity. According to the government, Benanti's testimony does not tie these trips to specific dates in 1980, so the jury could have concluded that one of them occurred on August 16. However, the government has mischaracterized Benanti's testimony, which, in fact, establishes that neither of the two planning meetings occurred on Deters's August 16 trip to Miami. The first meeting was held in early 1980 to plan the first flight to Colombia, Tr. 1754–55, which, as the government acknowledges, Brief of Appellee at xxviii, took place in mid-April 1980. The second Miami meeting to which Benanti testified, Tr. 1758–59, was to plan the second flight to Colombia; Benanti testified, Tr. 1759–60, and the government's statement of facts agrees, Brief of Appellee at xxviii, that this second flight took place on July 21, 1980. The evidence relied upon by the government thus provides no proof of Deters's purpose in traveling to Miami on August 16, 1980; finding no other evidence on this point in the record, we conclude that Deters's conviction on Count VII must be overturned.

## VII. Evidentiary Issues

### A. Prescott

Prescott raises several interrelated evidentiary questions that, should they be resolved in his favor, he contends would require reversal of his convictions for insufficient evidence.[22]

■ First, Prescott asserts that the portion of Schieche's testimony identifying him as the "Ronnie" with whom Deters dealt in Houston rests upon inadmissible hearsay, namely, Deters's 1982 statements that Ronald Prescott was the man in the Dallas hotel lobby. See *supra*, p. 851. Prescott contends that Deters's statements did not come within the coconspirator exception to the hearsay rule, Fed.R.Evid. 801(d)(2)(E),

---

22. We have already explained why Prescott's conviction on Count I cannot stand. See pp. 859–860 *supra*. The arguments discussed in this section of the opinion are still relevant to his conviction on Count VI (conspiracy to distribute cocaine and quaaludes).

because they were not made in furtherance of the conspiracy and because there was no independent evidence establishing his membership in the conspiracy. Prescott asserts that the statement was not made in furtherance of the conspiracy because it was part of a conversation about avoiding IRS detection of drug trafficking; "a conversation aimed at avoiding detection," he asserts, "can not be in furtherance of any conspiracy." Brief of Appellant Prescott at 10. This simply is not the law; avoiding detection is likely a central concern of any conspiracy. It is true, of course, that declarations made after the conspiracy's termination in an effort to avoid detection are not made in furtherance of the completed conspiracy. *Krulewitch v. United States,* 336 U.S. 440, 443–44, 69 S.Ct. 716, 718, 93 L.Ed. 790 (1949). But the conspiracy here had not terminated at the time of the statement in 1982; the indictment alleged that the conspiracy did not end until 1984, and there was evidence of continued (though unsuccessful) efforts by Deters, Holbrook, Benanti, and others to set up drug runs to Colombia after the time of the statements.

■ We must also disagree that Deters's statements were inadmissible because they were not supported by independent evidence of Prescott's membership in the conspiracy. First, the Supreme Court has recently held, in *Bourjaily v. United States,* — U.S. ——, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987), that it is not necessary that there be such evidence because, under Fed.R.Evid. 104(a), trial courts, in resolving preliminary factual questions concerning the admissibility of evidence, are not bound by the rules of evidence except those concerning privileges; therefore, the trial court may rely at least in part on the putative coconspirator's declaration to determine that the defendant was a party to the conspiracy. 107 S.Ct. at 2780.

■ In any event, independent evidence of Prescott's membership in the conspiracy was provided by Benanti's testimony concerning cocaine sales to Prescott. Prescott maintains that Benanti testified that he did not meet Prescott until 1983 and that the cocaine sales to Prescott came thereafter, significantly later than any drug transactions alleged in the indictment. This, he argues, not only means that Benanti's testimony does not establish his membership in the conspiracy, but also means that Benanti's testimony concerns "other crimes," and therefore was inadmissible under Fed.R. Evid. 404(b) and a prejudicial variance from the indictment.

In his testimony, Benanti did in fact state at one point that he first met Prescott in March or April of 1983, Tr. 1772, and that on five or six occasions thereafter he made cocaine sales of half a kilogram to a kilogram to Prescott. Tr. 1772–75. However, later in his testimony, Benanti testified that he sold to Prescott a portion of the cocaine he obtained from the Strusbergs in 1982 as a result of the aborted fifth trip to Colombia. Tr. 1779. This sale occurred not in 1983, but before Benanti's June 1982 arrest, Tr. 1780, and therefore provides independent evidence that Prescott was a member of the conspiracy.

The remainder of Benanti's testimony demonstrates that after his May 1982 arrest Benanti, though he discussed possible future drug transactions with Deters and others while acting as a government agent, never actually undertook any further drug activities with any of the defendants. Further, Benanti testified that he was introduced to Prescott by Deters at the Jockey Club in Miami, and that it was a holiday in March or April, Tr. 1772; Deters's ex-wife, Mary Amundsen, testified that at Easter in 1981, while on a joint vacation, the Deterses and Prescotts went to the Jockey Club in Miami. We therefore think that the trial court and the jury could properly have concluded that when Benanti said he met Prescott in 1983, he meant 1981; this defeats Prescott's "other crimes" and variance arguments.[23]

---

**23.** Prescott also objects that Amundsen's testimony that she once saw him use cocaine was inadmissible "other crimes" evidence under Rule 404(b). Since this testimony was elicited by Prescott's own attorney on cross-examination, Tr. 1731–32, we find this argument meritless.

## B. Caspersen

Caspersen argues that his Confrontation Clause rights were violated by Lager's testimony that Kragness stated that he and Teeter had previously taken marijuana flown into La Junta to Caspersen. The District Court initially admitted this evidence, but later ruled that while evidence of this confession was admissible against Kragness, given that Caspersen could not cross-examine this co-defendant, admission of the confession violated Caspersen's right to confront witnesses. Cr. No. 3–84–139, slip op. at 4–5 (D.Minn.Sept. 30, 1985). However, the District Court did not grant a mistrial to Caspersen, but instead simply ordered the government not to refer to this testimony in closing argument. *Id.* at 5.

▮ If the District Court was correct that this testimony was not directly admissible against Caspersen under the Confrontation Clause, then the Court's attempted cure was inadequate. The Supreme Court held in *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), that "a defendant is deprived of his rights under the Confrontation Clause when his nontestifying codefendant's confession naming him as a participant in the crime is introduced at their joint trial, even if the jury is instructed to consider that confession only against the codefendant." *Richardson v. Marsh,* — U.S. —, 107 S.Ct. 1702, 1704, 95 L.Ed.2d 176 (1987); *Cruz v. New York,* — U.S. —, 107 S.Ct. 1714, 1716, 95 L.Ed.2d 162 (1987). The Supreme Court adopted this narrow exception to the general assumption that jurors follow their instructions, *Richardson,* 107 S.Ct. at 1706–07, because the risk is simply too great that the jury will be unable to ignore such evidence, and the consequences of such a failure too vital to the defendant. *Bruton,* 391 U.S. at 135–36, 88 S.Ct. at 1627–28. We think it evident that if an instruction that the jury is not to consider such evidence against him is insufficient to avoid trenching upon a defendant's Confrontation Clause rights, mere silence on the matter is hardly adequate to the task; it may prevent further damage, but it cannot undo what has already been done.

▮ Nonetheless, we conclude that Caspersen's Confrontation Clause rights were not violated here, because Kragness's out-of-court statements were supported by sufficient "indicia of reliability" to be directly admissible against Caspersen, despite the lack of opportunity for cross-examination. See *Cruz,* 107 S.Ct. at 1718–19; *Lee v. Illinois,* 476 U.S. 530, 106 S.Ct. 2056, 2063–65, 90 L.Ed.2d 514 (1986). In *United States v. DeLuna,* 763 F.2d 897 (8th Cir.), *cert. denied,* 474 U.S. 980, 106 S.Ct. 382, 88 L.Ed.2d 336 (1985), we identified four factors relevant to the reliability inquiry under the Confrontation Clause:

> (1) whether the context of the statements and the persons to whom they were made suggest that the statements are reliable, (2) whether the declarant had a motive for lying, (3) whether the declarant had difficulty with his or her memory, and (4) whether the declarant had personal knowledge of the identity and role of the participants in the crime.

*Id.* at 910.

While it is not necessary that all four factors be present for there to be sufficient indicia of reliability to satisfy the Confrontation Clause, *DeLuna,* 763 F.2d at 911, we think each of them is present here. Kragness's statements were made not to the police, but to his long-time friend Richard Lager. This, plus the fact that Lager had already performed some tasks for Kragness that were related to the drug enterprise (lending Kragness $1,000 and finding the La Junta property), indicates that the statements were reliable. Kragness was recruiting Lager to take on a bigger role in the enterprise, and may therefore, as Caspersen suggests, have had an incentive to do some "puffing" in his description of the business and its potential rewards. But telling Lager that Caspersen, a man Lager did not know, was involved in the business would not have furthered such a goal. There is no indication that Kragness had any reason to lie about Caspersen's involvement, nor is there any evidence that Kragness had memory problems. As a participant in the activities he described to Lager, Kragness had personal knowledge of Cas-

persen's identity and of the role he played. We therefore think that Kragness's statements bore sufficient indicia of reliability to render Lager's testimony consistent with the Confrontation Clause.[24]

### C. Kragness

■ Kragness challenges two aspects of the testimony of John Teeter's widow, Robin Moon. First, Kragness asserts that the District Court allowed the introduction of inadmissible hearsay by permitting Moon to testify to Teeter's statements to her about his activities with Kragness. Review of Moon's testimony reveals that it contains only one such statement concerning Kragness. Moon testified that her husband had obtained the money for a home he purchased from smuggling marijuana. Tr. 222. Moon did not state that Kragness was involved in this smuggling, but did testify that: "[Teeter] did tell me that Mr. Kragness had helped him get the downpayment money together." Tr. 223. While this was hearsay, Kragness did not make any contemporaneous objection to it, and therefore may not challenge it now. Fed. R.Evid. 103(a)(1).

■ Next, Kragness challenges Moon's testimony offered in response to government questions about whether Teeter and Kragness had "any legitimate business together" on dates in 1976 and 1977, that Teeter and Kragness had no legitimate or legal business together on those dates. Tr. 225–26. Kragness's counsel did lodge a contemporaneous objection to these questions, but did so on the ground that the government was asking a "loaded question," Tr. 225, or "a when-did-you-stop-beating-your-wife question," Tr. 226. He did not object that the testimony was without foundation and may not raise such an objection now. Fed.R.Evid. 103(a)(1). Had he raised such an objection, Kragness's counsel might have conducted a *voir dire*

of Moon to determine whether her testimony was based upon hearsay, speculation, or some similarly infirm foundation; as it stands, her testimony purports to be based on personal knowledge.

### VIII. The Prosecutor's Closing Argument

### A. Privilege Against Self-Incrimination

The defendants raise several objections to the content of the prosecutor's closing argument. First, each defendant asserts that the prosecutor's repeated assertions that government testimony and documentary evidence was "uncontradicted," "undisputed," and "unrebutted," undermined the presumption of innocence and was impermissible commentary upon his decision not to testify.

■ A direct comment by the prosecutor upon the defendant's failure to testify invades his Fifth Amendment privilege against self-incrimination. *Griffin v. California*, 380 U.S. 609, 615, 85 S.Ct. 1229, 1233, 14 L.Ed.2d 106 (1965). In prior cases, this Court has made clear that ambiguous or indirect references, such as references to "uncontradicted" or "undisputed" government evidence, are impermissible where they manifest the prosecutor's intention to draw attention to the defendant's failure to testify, or where the jury would naturally or necessarily take them as a comment on the defendant's failure to testify. *E.g., United States v. Nabors*, 762 F.2d 642, 649–50 (8th Cir.1985); *United States v. Durant*, 730 F.2d 1180, 1184 (8th Cir.), *cert. denied*, 469 U.S. 843, 105 S.Ct. 149, 83 L.Ed.2d 87 (1984). While use of the words "uncontradicted," "undisputed," and "unrebutted" may not be as problematic as use of the word "undenied," which by itself "carries a strong connotation that somehow the defendant himself has failed to rebut a particular point of evidence," *Unit-*

---

**24.** Caspersen also argues that the District Court erred in refusing to admit evidence of pre-indictment self-exculpatory statements that Caspersen made to an investigating FBI agent. We think these statements were clearly inadmissible hearsay, and reject Caspersen's argument as insubstantial.

We also reject as insubstantial Caspersen's claim that a "time-line" (a chart showing the government's version of the sequence of events) which the jury was permitted to see during one government witness's testimony was not a fair summary of the evidence.

ed States v. Sanders, 547 F.2d 1037, 1042–43 (8th Cir.1976), *cert. denied,* 431 U.S. 956, 97 S.Ct. 2679, 53 L.Ed.2d 273 (1977), even these terms are troublesome where the only source for evidence to rebut or contradict the point is the defendant.

Here, the prosecutor asserted many times in his closing argument that government evidence was uncontradicted, undisputed, and/or unrebutted. A number of these assertions referred to evidence that arguably could have been rebutted only by the testimony of a defendant. At least seven times in this litany the prosecutor characterized as undisputed or uncontradicted the testimony of a government witness about a particular conversation he or she had with one or more of the defendants outside the presence of any other person. For example, the prosecutor made this assertion about Lager's testimony concerning Kragness's description of his past marijuana activities during his recruitment of Lager. Tr. 3141. See also Tr. 3139, 3147–49.[25]

The defendants repeatedly objected to the prosecutor's assertions that evidence was uncontradicted or unrebutted, and eventually were granted a continuing objection to such references. Tr. 3149. The District Court overruled each of the defendants' objections when it was made. However, after the prosecutor had argued for about an hour, there was a recess, after which the Court gave the following instruction:

> [the prosecutor] argued to you this morning, a bit ago that its case against some of the defendants was uncontroverted or that there was no evidence presented to contradict the government's evidence. I remind you that it is the law—and I will tell you about it more extensively later—that a defendant in a criminal case is not compelled to testify and has no burden of calling any witnesses or producing any evidence, and no presumption of guilt nor

any inference of any kind can be drawn from the fact that a defendant chooses not to testify.

> I also remind you that the comments which the prosecutor has made and will make and the comments which other lawyers will make are not evidence in the case.

Tr. 3178–79. While the prosecutor made several further assertions that evidence was uncontradicted or undisputed in the remainder of his closing argument and his rebuttal argument, he did not do so again in reference to specific pieces of evidence that could be contradicted only by a defendant.

 We view the prosecutor's statements with great concern. Nonetheless, prosecutorial comment upon a defendant's failure to testify is not *per se* reversible error, but is subject to harmless-error analysis. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *Sanders,* 547 F.2d at 1042. Though the question is a close one, we conclude that the District Court's instruction cured any error involved in the prosecutor's statements.

First, we see nothing in the record to show that the prosecutor intended that these statements draw attention to any defendant's failure to testify. Whether the jury nevertheless "naturally and necessarily" would have taken them as a comment on failure to testify is a matter which is not entirely free from doubt. Nothing in any of the problematic statements or their context pointed out to the jury that the evidence in question could have been contradicted only by a defendant. The prosecutor said nothing to distinguish the evidence labeled "uncontradicted" in these comments from that which he labeled "uncontradicted" in a plethora of other statements that did not involve Fifth Amendment

---

**25.** The prosecutor also stated several times that the government's entire case was essentially undisputed and uncontradicted, see, *e.g.,* Tr. 3133, 3163, and occasionally asserted that all of a particular government witness's testimony was uncontradicted, see, *e.g.,* Tr. 3704 (Benanti's testimony). However, these statements do not refer to specific points of evidence, such as testimony of a one-on-one conversation, that could be contradicted only by a defendant, so they would not naturally and necessarily have been taken by the jury as a comment on failure to testify. They were inaccurate statements, since much of the government's evidence was disputed, but this was a matter for the jury to recall.

rights. Instead, only after some independent reflection would a juror have realized that the evidence referred to in the problematic statements could have been contradicted only by a defendant.

On the other hand, the District Court issued a stern instruction concerning the government's burden and the right of the accused not to testify, specifically linking it to the prosecutor's arguments that evidence was uncontradicted. The prosecutor's further assertions that evidence was undisputed did not violate the privilege against self-incrimination. Therefore, with some hesitation, we conclude the prosecutor's remarks did not prejudically affect substantial rights of the defendants. See *United States v. Boyce*, 797 F.2d 691 (8th Cir.1986); *United States v. Lee*, 743 F.2d 1240, 1254 (8th Cir.1984).

Notwithstanding our conclusion in this case, we deem it advisable to reiterate the admonition Judge Webster issued on behalf of this Court in *Sanders:*

> A prosecutor who refers to the evidence as ["uncontradicted" or "unrebutted"] when the defendant has not taken the stand exposes his case to the possibility of reversible error and necessarily calls into play a more searching review of the evidence on appeal than would otherwise be required. Prosecutors may strike hard blows but not foul ones.... [T]he risk is simply not worth the candle and is increasingly likely to offend the conscience of the court.

547 F.2d at 1043 (citation omitted).

### B. Prosecutor Testimony

Deters, Holbrook, and Prescott cite as grounds for reversal statements the prosecutor made in rebuttal argument about the tapes Benanti made while working as an undercover agent for the government after his arrest. In closing argument, attorneys for these defendants, particularly Deters's attorney, who devoted most of his argument to the matter, argued that these tapes were a fraud. They theorized that Benanti, together with two or more cronies, perhaps Pucci and Aleto, had fabricated the tapes so that Benanti could provide the evidence the government desired of him and thereby obtain a lighter sentence. Deters's counsel pointed out a number of things about each tape that he contended showed that they were phony, and noted that only Benanti had testified as to the identity of the persons speaking on the tapes.

Two of the tapes introduced into evidence were of a conversation that Benanti testified he had with Deters and Holbrook in a cocktail lounge in Chicago's O'Hare airport. P.Ex. 8N. In the conversation, Benanti and the persons he identified as Deters and Holbrook discuss past drug activities and many of the participants in them, including Prescott, possible future drug activities, and ongoing government investigations. Testifying about how he had recorded face-to-face conversations such as this, Benanti stated: "They attach a small wire to you. It's just a small tape recorder you put under your belt, and you just run a wire up your chest or under your arm." Tr. 1785. The last of a number of points Deters's attorney made in attacking the authenticity of the O'Hare tapes focused upon the fact that the conversation was recorded on three sides of two cassette tapes. How, Deters' attorney asked, was Benanti supposed to have managed flipping or changing tapes in a recorder hidden under his belt while sitting in the cocktail lounge with Deters and Holbrook present? Tr. 3364.

In response to this, the prosecutor asserted that the tapes before the jury were not the original recording made by Benanti, which had in fact been a single tape. There are two pieces of evidence in the record that bear upon this debate, but neither provides any definitive answer. First, the prosecutor and Benanti had the following exchange concerning the O'Hare tapes:

> (Prosecutor) Q: Is it one tape or two tapes?
>
> (Benanti) A: One tape.
>
> Q: For you, one. But was it recorded on two cassettes? Do you know?
>
> A: I don't know.

Tr. 1801. In addition to this there are the cassettes themselves, each of which bears

the words "Edited Version" on its face. This does show that the tapes before the jury, were not in their original condition, but does not prove that the recording was originally on one tape. The words "Edited Version" may refer only to the fact there are a number of blank spots in the tape where the conversation was recorded over to remove material not relevant to the case, and not to whether, in editing, the tape was broken up from one tape into three tape sides.

■ The problem here is that the prosecutor did not content himself to argue solely from this evidence. While the trial court has broad discretion in controlling closing arguments, reversal is nonetheless appropriate where a prosecutor's argument to the jury " 'was so offensive as to deprive the defendant of a fair trial.' " *United States v. Bohr*, 581 F.2d 1294, 1301 (8th Cir.), *cert. denied*, 439 U.S. 958, 99 S.Ct. 361, 58 L.Ed.2d 351 (1978), quoting *Isaacs v. United States*, 301 F.2d 706, 736 (8th Cir.), *cert. denied*, 371 U.S. 818, 83 S.Ct. 32, 9 L.Ed.2d 58 (1962). One circumstance in which this standard may be violated is where the prosecutor does not simply argue to the jury about reasonable inferences that may be drawn from the evidence, but instead argues that facts of which there is no evidence in the record support his view of the case. *United States v. Segal*, 649 F.2d 599, 604 (8th Cir.1981); *United States v. Bigeleisen*, 625 F.2d 203, 210 (8th Cir. 1980).

■ Here, over the defendants' objections, the prosecutor was permitted to make a number of statements concerning the tapes for which the government has cited and we can find no support in the record. These included the following:

[T]hese are not the original tapes ... This is at least a fifth-generation copy. Tr. 3654.

And what happens is the tape obviously has to be transcribed so that you can hear it played in Court.... [T]hat's how they get onto cassettes like this—is they have to be transferred from the body recorder, which is not a cassette, onto cassette tapes. And then—and, in fact,

they had to be transferred onto two cassette tapes because the tape was too long for just one cassette.... The original tape was simply too long....

Tr. 3655. We see no evidence in the record to show that there were five or more generations of this recording, that the original version was not in cassette form, or that the original version was one tape that was broken down during transcription because it was too long to fit on one cassette. Here, as in *Bigeleisen*, 625 F.2d at 210, the prosecutor did not assert that these things *might* be true, but asserted that they were true; in so doing, he overstepped the boundaries that govern closing argument.

The question remains whether the prosecution's argument was nonetheless harmless beyond a reasonable doubt. See *Chapman v. California, supra*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705; *Segal*, 649 F.2d at 604. We conclude that it was, for two main reasons. The evidence against Deters, Holbrook, and Prescott was strong (except, of course, as to Deters on Count VII and Prescott on Count I, convictions which must be reversed for reasons explained earlier in this opinion). Although the Benanti tapes were an important part of the case, about which counsel spoke at length in their closing argument, the issue of re-recording from a single reel to several was only one of many attacks mounted against the tapes by defense counsel, and with respect to these other questions the government made convincing rebuttal arguments that were not improper. The question is this: Would the jury have acquitted the defendants, or at least not convicted them, if the government's improper argument had not been made? We think the chance of any such thing's happening is negligible. Though all doubt cannot be excluded, no reasonable doubt remains, and the error is harmless.

We reject the defendants' other arguments concerning the prosecutor's closing argument as not substantial. First, despite the assertions of the defendants to the contrary, we see no place in the prosecutor's argument where he personally vouched for the credibility of witnesses.

See *Segal,* 649 F.2d at 604 (improper for prosecutor to give personal assurances of witness's veracity). We also disagree that it was improper for the prosecutor, in response to the defendants' assertion that the government should have called witnesses besides Benanti to identify the voices on the tapes, to point out that the defendants could also have called those witnesses had they thought that their testimony would be helpful. Nor do we agree with the defendants that the prosecutor's statements concerning overt and predicate acts alleged in the indictment but not proven at trial amounted to an assurance that the government could have, had it desired, proved the allegations; instead, as we read the prosecutor's argument, he merely made clear that the government did not have to prove each of the acts alleged to win its case. See Tr. 3684–86. Finally, we also reject as without merit defense arguments concerning statements by the prosecutor and the District Court concerning the possibility of forfeiture proceedings following deliberations on the case in chief, see Tr. 3073, 3713, and concerning comments by the prosecutor about a chart used by Caspersen's attorney in closing argument, see Tr. 3637–40.

## IX. Conclusion

The convictions are affirmed, except for Prescott's conviction on Count I, Caspersen's conviction on Count II, and Deters's conviction on Count VII, which are reversed.[27]

It is so ordered.

27. The renewed or second motions of Deters, Caspersen, Prescott, and Holbrook for release pending appeal are denied.